IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIELLE BOLOGNA et al., | No. C 09-2272 SI |
| Plaintiffs, | **ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS; and** |
| v. | **ORDER TO SHOW CAUSE WHY ACTION SHOULD NOT BE REMANDED TO SAN FRANCISCO SUPERIOR COURT** |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | |
| Defendants. / | |

Defendants have filed a motion to dismiss the complaint. This motion is scheduled for hearing on August 14, 2009. Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for resolution without oral argument and VACATES the hearing. Having considered the papers submitted, and for good cause shown, the Court hereby GRANTS IN PART defendants' motion.

**BACKGROUND**

This case arises out of the deaths of Anthony Bologna and his two sons, Michael and Matthew Bologna, on June 22, 2008. The Bolognas were stopped in traffic in San Francisco when Edwin Ramos allegedly shot and killed them.[1] They are survived by the plaintiffs in this case: Danielle Bologna (Anthony's wife) and her two children, Andrew (who was in the car at the time of the shooting but survived) and Francesca Bologna.

---

[1] For the purposes of this 12(b)(6) motion, the Court assumes the truth of the factual allegations in plaintiffs' complaint. No factual findings of any kind are made here. There has been no resolution of the underlying criminal charges against Edwin Ramos, which are pending in San Francisco Superior Court.

The complaint alleges that Edwin Ramos is a citizen of El Salvador but had lived in San Francisco for years before the June 22 incident. He was in this country in violation of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* Ramos was a member of the Mara Salvatrucha (or "MS-13") street gang at the time of the Bologna shootings and is currently incarcerated and awaiting trial. This is not Ramos' first encounter with law enforcement officials in San Francisco. He has been arrested by San Francisco police officers on multiple occasions for violent crimes and drug offenses and has been identified as a suspect in other serious crimes, including murder. When Ramos was a minor, City officials transported him to and kept him at a group home for juveniles and the Log Cabin Ranch School, which is a post adjudication facility for male juveniles who have been adjudged delinquent. Police officers knew that Ramos was a member of MS-13 and that, according to plaintiffs, MS-13 members are likely to murder men who are not members of MS-13 and appear to be Latino or black. Plaintiffs contend that Ramos shot the Bolognas because they appeared to him to be Latino.

The complaint alleges that prior to the Bologna shootings, the City and County of San Francisco adopted "sanctuary policies," whereby City officials harbored individuals they knew to be illegal aliens who had committed drug offenses and violent crimes. Plaintiffs contend that San Francisco's sanctuary policies violated state and federal laws. Plaintiffs also allege that if at the time of any of Ramos's prior arrests San Francisco officials had reported Ramos to United States Immigration and Customs Enforcement ("ICE"), it is a certainty that ICE would have initiated removal proceedings against him and that Ramos would have been deported. According to plaintiffs, although San Francisco police officers knew that they were required by state law to report Ramos' drug-related arrests and detentions to federal immigration officials, they were prevented by the sanctuary policies from doing so. The crux of plaintiffs' complaint is that it was reasonably foreseeable to defendants that Ramos would shoot Anthony, Michael, and Matthew Bologna, and that defendants could have prevented these deaths because if they had complied with state law and reported Ramos to federal immigration officials, Ramos would have been deported to El Salvador.

Plaintiffs filed a complaint against the City and County of San Francisco, Mayor Gavin Newsom, Police Chief Heather Fong, and Chief of the Juvenile Probation Department William Siffermann in San Francisco Superior Court on April 3, 2009. Plaintiffs allege five causes of action: negligence; negligent

2

infliction of emotional distress; violation of the California constitution, Gov. Code § 815.6 *et seq.*; violation of the decedents' constitutional rights under 42 U.S.C. § 1983; and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1601, *et seq.* Defendants invoked federal question jurisdiction and removed to this Court on May 22, 2009.

Defendants now move to dismiss plaintiffs' complaint. For the reasons set out below, the Court in this order will address only plaintiffs' federal claims (§ 1983 and RICO).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007). While courts do not require "heightened fact pleading of specifics," *id.*, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," *id*. at 1965. Plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Id.* In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *St. Clare v. Gilead Scis., Inc.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

**DISCUSSION**

**1.    Statutory Scheme**

Section 1373 of Title 8 of the United States Code prevents federal, state, or local government entities from "prohibit[ing], or in any way restrict[ing], any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service ['INS'] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). Federal law also imposes a criminal penalty on any person who "transports . . . [an illegal] alien within the United States," "conceals, harbors, or shields from detection" any such individual, or "encourages or induces an alien to come to, enter, or reside in the United States[.]" 8 U.S.C. § 1324(a)(1)(A).

California law provides that when there is reason to believe that any person arrested for a violation of various controlled substance statutes may not be a U.S. citizen, "the arresting agency shall notify the appropriate agency of the United States having charge of deportation matters." Cal. Health & Safety Code § 11369.

San Francisco Administrative Code, Chapter 12H provides, in relevant part:

> No department, agency, commission, officer or employee of the City and County of San Francisco shall use any City funds or resources to assist in the enforcement of federal immigration law or to gather or disseminate information regarding the immigration status of individuals in the City and County of San Francisco unless such assistance is required by federal or State statue, regulation or court decision.
>
> Nothing in this Chapter shall prohibit, or be construed as prohibiting, a law enforcement officer from identifying and reporting any person pursuant to State or federal law or regulation who is in custody after being booked for the alleged commission of a felony and is suspected of violating the civil provisions of the immigration laws. In addition, nothing in this Chapter shall preclude any City and County department, agency, commission, officer or employee from (a) reporting information to the INS regarding an individual who has been booked at any county jail facility, and who has previously been convicted of a felony . . . ; (b) cooperating with an INS request for information regarding an individual who has been convicted of a felony . . . ; or (c) reporting information as required by federal or state statute . . . .

*See* Pls. Opp, appendix A.

San Francisco Police Department General Order 5.15 (December 13, 1995) instructs police department employees that "Members shall not enforce immigration laws or assist the INS in the

4

enforcement of immigration laws." *See* Pls. Opp, appendix B.[2] The General Order also provides that officers shall not inquire into an individual's immigration status unless the individual has been arrested for (1) various offenses involving controlled substances, (2) is in custody after being booked for alleged commission of a felony, (3) is booked after previously having been convicted of a felony, or (4) if the INS makes a request for information and the individual has previously been convicted of a felony. *Id.*

On August 23, 2006, Chief Fong issued a department bulletin emphasizing that Administrative Code 12H.1 and General Order 5.1 were still in effect. *See* Pl. Opp., appendix C. The bulletin also stated that participation in interagency operations with ICE and other federal agencies required prior written authorization. *Id.*

Finally, on March 1, 2007, Mayor Newsom issued Executive Order 7-01, which ordered City departments to ensure that they were in compliance with Administrative Code 12H. *See* Pl. Opp., appendix D.

**2.    Violation of Constitutional Rights**

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988). Plaintiffs' § 1983 claim is premised on alleged violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

**A.    Equal Protection**

The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state a claim for denial of equal protection, the plaintiff must show that he was treated differently from persons similarly situated or that

---

[2] The Court may consider Police Department General Order 5.15 and the August 2006 Police Department bulletin because these documents are referenced in the complaint. *See* Complaint ¶ 22; *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (A district court may consider documents outside the complaint if their "authenticity is not contested and the plaintiff's complaint necessarily relies on them.").

5

Case 3:09-cv-02272-SI   Document 18   Filed 08/11/09   Page 6 of 12

1 the defendant acted with an intent to discriminate against him based on his membership in a protected
2 class. *See Washington v. Davis*, 426 U.S. 229, 239-40 (1976); *Lee v. City of Los Angeles*, 250 F.3d 668,
3 686 (9th Cir. 2001). Here, plaintiffs contend that defendants violated the Equal Protection Clause by
4 treating U.S. citizens and undocumented immigrants differently and by releasing Ramos without
5 notifying immigration officials of his arrest.

### i. Differential treatment of U.S. citizens and undocumented immigrants

Plaintiffs contend that San Francisco's sanctuary policies require City officials to treat violations of federal immigration laws by U.S. citizens and undocumented immigrants differently. Specifically, plaintiffs claim that the City discriminates against U.S. citizens by reporting them to federal immigration officials if they violate immigration laws that prohibit transporting or harboring undocumented immigrants or inducing them to enter this country (8 U.S.C. §§ 1324 (a)(1)(A)(ii)-(iv)), smuggling undocumented immigrants (8 U.S.C. § 1324(a)(3)), or importing undocumented immigrants for immoral purposes (8 U.S.C. § 1328), while they do not report undocumented immigrants who violate immigration laws by being in this country unlawfully. Defendants respond that plaintiffs do not have standing to bring this claim on behalf of U.S. citizens whose violations of federal immigration laws have been reported by San Francisco officials to ICE. The Court agrees.

"To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Stormans, Inc. v. Selecky*, 571 F.3d 960, 970 (9th Cir. 2009) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000)). A plaintiff may have standing to pursue a claim on behalf of third parties if, in addition to suffering an injury in fact, the plaintiff has "a close relation to the third party," and there is "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (citing *Singleton v. Wulff*, 428 U.S. 106, 112-14 (1976)).

Plaintiffs have no standing to pursue the claims of U.S. citizens whose immigration crimes have been reported to ICE. Neither plaintiffs, nor the decedents, were "U.S. citizens whose immigration

6

crimes have been reported to ICE," and plaintiffs' injury – the loss of Anthony, Michael and Matthew Bologna – is certainly not "fairly traceable" to the failure to report U.S. citizens to ICE.

In any event, even if plaintiffs did have standing to bring this claim, they cannot allege that San Francisco officials treated similarly situated individuals differently. The offense of transporting or harboring undocumented immigrants, or encouraging them to stay in this country, is very different from the offense of being present in the U.S. unlawfully. Further, there is no allegation that San Francisco declines to report or prosecute undocumented immigrants for transporting or harboring undocumented immigrants, or encouraging them to stay in this country.

Accordingly, the Court finds that plaintiffs cannot state a claim that defendants violated the equal protection rights of U.S. citizens whose immigration offenses defendants report to federal authorities.

### ii. Release of Ramos without notifying immigration officials of his arrest

Plaintiffs also argue that defendants violated the Equal Protection Clause by failing to report Ramos' prior arrests to ICE. According to plaintiffs, San Francisco's non reporting policy discriminated against individuals who are, or appear to be, Latino because members of MS-13 are likely to attack Latinos who are not members of their gang.[3] Plaintiffs' claim, then, is that San Francisco's sanctuary policy has a disparate impact on people who are, or appear to be, Latinos. Disparate impact alone, however, is insufficient to establish a § 1983 violation. Section 1983 claims "based on Equal Protection violations must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent." *Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022, 1026 (9th Cir. 1998). Defendants point out that plaintiffs do not allege that San Francisco officials did not report Ramos's immigration status because they intended for him to harm Latinos. The Court agrees with defendants that plaintiffs' failure to allege intentional discrimination defeats their equal protection claim.

---

[3] The Court notes that the sanctuary policy, as set forth in Administrative Code 12H, expressly permits law enforcement officers to comply with state and federal laws that require reporting any person "who is in custody after being booked for the alleged commission of a felony and is suspected of violating the civil provisions of the immigration laws" to immigration officials. Plaintiffs allege, however, that San Francisco had an "unwritten but enforced policy that prohibited and discouraged" San Francisco employees from reporting undocumented immigrants to ICE. Complaint ¶ 23(b).

### B. Due Process

Plaintiffs argue that defendants violated the Due Process Clause by failing to protect plaintiffs' decedents from Ramos. Plaintiffs argue that defendants can be held liable under the state-created danger doctrine. "[A]lthough the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action 'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (citing *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 197 (1989)). State actors affirmatively place an individual in danger by acting with "deliberate indifference to a known or obvious danger in subjecting the plaintiff to it." *Id.* at 1062 (citing *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).

According to plaintiffs, defendants placed the Bolognas in danger by instructing San Francisco police officers not to report Ramos to ICE. Plaintiffs allege that had defendants not acted, San Francisco police officers would have reported Ramos's prior drug-related arrests to federal immigration officials, who would have deported Ramos, thus preventing him from shooting the Bolognas. Plaintiffs appear to argue that the class of people defendants placed in danger consisted of all black and Latino residents of San Francisco, as well as all people who appear to belong to those groups.

Plaintiffs' argument fails because there is no authority for the proposition that the state-created danger doctrine can apply when the population of a city – or a subset consisting of racial or ethnic groups in that city and people who appear to belong to those groups – is placed at risk. Plaintiffs' theory contravenes the general rule that the Due Process Clause does not impose an affirmative duty upon the state to protect its citizens against the acts of private third parties. *See Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007) (citing *DeShaney*, 489 U.S. at 197).

The authorities cited by plaintiffs demonstrate that the state-created danger doctrine is implicated when a state actor creates a risk that is specific to an individual or small group of individuals, rather than to the general public. *See, e.g.*, *Kennedy*, 439 F.3d at 1063 (holding that state created danger doctrine applied where police officer notified suspect who was known to be violent that the plaintiff had accused

8

him of child molestation without first warning the plaintiff); *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086-87 (9th Cir. 2000) (holding that doctrine applied where intoxicated bar patron died of hypothermia after police officers ordered him to leave a bar and not to drive a vehicle on bitterly cold night in Montana); *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989) (holding that doctrine applied where police officer ejected a woman from the vehicle in which she was a passenger in high-crime neighborhood at 2:20 a.m.); *Schroeder v. San Diego Unified School Dist.*, 2009 WL 1357414, at \*9 (S.D. Cal. May 13, 2009) (holding that doctrine applied where state actors placed student with history of discipline problems as a peer tutor in small class of students who had severe mental disabilities). Unlike the injured parties in *Kennedy*, *Munger*, *Wood*, and *Schroeder*, who were specific individuals exposed to specific danger, in this case plaintiffs contend that the entire general population of people in San Francisco who are (or appear to be) black or Latino were placed at risk. Due process claims simply do not stretch so far.

Accordingly, the Court finds that plaintiffs cannot state a due process claim.

### C.   RICO

Plaintiffs agree with defendants that a municipality cannot possess the requisite *mens rea* to commit a RICO violation. *Pedrina v. Chun*, 97 F.3d 1296, 1300 (9th Cir. 1996). Instead, plaintiffs bring their RICO claim against Mayor Newsom, Chief Fong, and Chief Siffermann in their individual capacities.

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1601, *et seq.* grants a private right of action to any person "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The elements of a civil RICO claim are as follows: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property.'" *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (citing 18 U.S.C. §§ 1964(c), 1962(c)). "Racketeering activity" is any act indictable under several provisions of title 18 of the United States Code, including certain violations of the Immigration and

Nationality Act ("INA"). *See* 18 U.S.C. § 1961(1)(F).

When violations of the INA are alleged to constitute predicate acts for RICO purposes, the immigration offenses must be "committed for the purpose of financial gain." 18 U.S.C. § 1961(1)(F). Plaintiffs' financial gain theory is that Siffermann harbored undocumented immigrants at the Log Cabin Ranch in order to increase occupancy at the facility so that he could justify appropriations for its operation and keep his employment secure.

Plaintiffs' complaint is devoid of any factual allegations to support this theory, such as the percentage of residents at Log Cabin Ranch who are undocumented immigrants and whether Siffermann's continued employment as director of the Juvenile Probation Department is contingent on a certain level of occupancy at this facility. Plaintiffs also fail to explain what financial benefit Fong and Newsom gained from this scheme.

Even assuming for purposes of discussion that Chief Siffermann harbored undocumented juvenile immigrants at Log Cabin Ranch for financial gain, plaintiffs' claim fails because they cannot allege that any such "racketeering activity" bears a direct connection to plaintiffs' injury, i.e. the loss of their property interest in Anthony Bologna's future wages. Plaintiffs must allege facts establishing that Chief Siffermann's acts were a proximate cause of plaintiffs' injury. *See Diaz v. Gates*, 420 F.3d 897, 901 (9th Cir. 2005) ("[T]he Supreme Court has already told us that 'by reason of' incorporates a proximate cause standard, which is generous enough to include the unintended, though foreseeable, consequences of RICO predicate acts.") (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-68 (1992); *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339 (1928)). "[T]he proximate cause of an injury is a substantial factor in the sequence of responsible causation." *Oki Semiconductor Co. v. Wells Fargo Bank, N.A.*, 298 F.3d 768, 773 (9th Cir. 2002) (citation omitted); *see also Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 979 (9th Cir. 2008) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").

Plaintiffs' theory of proximate causation appears to be that Chief Siffermann violated the INA by (1) repeatedly transporting Ramos to Log Cabin Ranch and (2) housing him at the facility, which (3)

encouraged Ramos to stay in this county.[4] Ramos therefore continued to reside in the United States and was able to kill Anthony Bologna, causing plaintiffs to lose their interest in Mr. Bologna's future income.

Plaintiffs' theory lacks key factual allegations, including that housing Ramos in a detention facility encouraged him to stay in this county and that it was foreseeable to Siffermann that Ramos would commit violence upon his release (e.g. that Ramos was a member of MS-13 when he was a juvenile). Moreover, this causal chain is too attenuated to sustain a RICO claim. Plaintiffs' contention that Ramos's harm to the Bolognas was a foreseeable consequence of his detention at Log Cabin Ranch is highly speculative. Because the alleged racketeering activity here is at best remotely related to Anthony Bologna's death, plaintiffs have not adequately alleged, and cannot allege, that it was a substantial cause of plaintiffs' injury.

Accordingly, the Court finds that plaintiffs have failed to allege causation, an essential element of their RICO claim.

### 3.     Leave to Amend

Having determined that plaintiffs have failed to sufficiently allege their § 1983 and RICO claims, the Court must decide whether to grant them leave to amend. As this is defendants' first motion to dismiss, the Court would generally afford plaintiffs an opportunity to address the deficiencies in their pleadings. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000). Here, however, further amendment would be futile. Plaintiffs' claims fail not for lack of specificity in their factual allegations, but because of fundamental flaws in their legal theories. Accordingly, the Court dismisses plaintiffs' federal claims with prejudice.

---

[4] Plaintiffs also argue that employees working for Chief Siffermann were required by state law to report Ramos to federal immigration authorities but instead transported him to Log Cabin Ranch. This breach, according to plaintiffs, was a proximate cause of plaintiffs' injury because it allowed Ramos to stay in this country when he should have been deported. Plaintiffs' argument fails because this alleged violation of state law cannot constitute a predicate act under RICO as it is not among the offenses enumerated in 18 U.S.C. § 1961(1).

11

**4.    Disposition of Case**

With plaintiffs' federal claims dismissed from this case, there appears to be no basis for this Court's exercise of jurisdiction.  Accordingly, the Court orders the parties to show cause why this case shall not be remanded to San Francisco Superior Court.  If defendants oppose remand, they shall state the basis for their opposition in a letter brief of no more than five pages filed by August 21, 2008. Plaintiffs' reply, if any, shall be filed by August 28, 2009 and shall not exceed five pages.

**CONCLUSION**

For the foregoing reasons, defendants motion to dismiss is GRANTED IN PART and dismisses plaintiffs' federal claims with prejudice.  **If defendants oppose remanding this case to state court, they shall file an opposition by August 21, 2009.  Plaintiffs reply, if any, shall be filed by August 28, 2009.  The Case Management Conference set for August 15, 2009 is VACATED and will be rescheduled when/ if necessary.**

**IT IS SO ORDERED.**

Dated: August 11, 2009

*Susan Illston*

SUSAN ILLSTON
United States District Judge